## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION       : <br><br> Plaintiff,            : <br><br> vs.                 : <br><br> JOHN T. PLACE,        : <br> PAUL G. KIRK,         : <br> JOHN P. KIRK,         : <br> GLOBAL TRANSITION SOLUTIONS, INC.,    : <br> and              : <br> GLOBAL TRANSITION SOLUTIONS, LLC,    : <br><br> Defendants.        : | Civil No. <br><br> **Jury Trial Demanded** |

## COMPLAINT

For its complaint against Defendants John T. Place ("Place"), Paul G. Kirk ("Paul Kirk"),

John P. Kirk ("John Kirk"), Global Transition Solutions, Inc. ("GTS, Inc."), and Global

Transition Solutions, LLC ("GTS, LLC"), Plaintiff United States Securities and Exchange

Commission (the "Commission") alleges as follows:

### SUMMARY

1.      This is a securities enforcement action arising out of the defendants' long-

standing scheme to defraud their customers regarding the fees the defendants charged in

connection with securities transactions.

2.      From at least October 2006 until at least February 2014 (the "relevant period"),

Place, John Kirk, and Paul Kirk operated and controlled a "transition management" brokerage

consulting business called Global Transition Solutions ("GTS").   GTS purported to assist customers – typically, public pension funds – execute massive securities transactions when "transitioning" a large portfolio from one investment manager or strategy to another, or simply when liquidating a large securities position altogether.

3.      The defendants told many customers and prospective customers that GTS would receive *only* "stated" or explicitly disclosed commissions and would serve as a fiduciary to the customer.

4.      The defendants did not, however, tell their customers that they would coordinate with routing brokers to impose mark-ups on the transactions the routing brokers handled.  These markups were sometimes imposed on a wholly *ad hoc* and opportunistic basis, at the direction of Place and GTS – in many cases, based on their perception of their customers' sophistication.

5.      The defendants also did not tell their customers that GTS shared in the pool of revenue created by these mark-ups, nor did defendants ever specifically disclose the existence or amounts of these mark-ups in post-trade reports delivered to customers.

6.      While purporting to act as a fiduciary, defendants concealed these proceeds from customers.  Worse, with at least two of the routing brokers, the defendants also prepared bogus invoices for execution research ostensibly used by the routing brokers, called "Trade Cost Analysis" or "TCA," but that GTS provided primarily as an excuse for the routing brokers' illicit payments to GTS.

7.      During the relevant period, this undisclosed revenue totaled at least $13 million.

## NATURE OF PROCEEDING AND RELIEF SOUGHT

8.      Based on the defendants' unlawful conduct, the Commission seeks permanent injunctions against each of the defendants, enjoining each from engaging in the transactions,

acts, practices, and courses of business alleged in this complaint, disgorgement of all profits realized from the unlawful conduct set forth herein, joint and several liability, civil penalties pursuant to Section 21(d)(3) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78u(d)(3)*], and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.      The Commission brings this action pursuant to Section 21(d) of the Exchange Act [*15 U.S.C. § 78u(d)*], to enjoin such transactions, acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

10.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), and 78aa*].

11.     Venue in this district is proper under Section 27 of the Exchange Act [*15 U.S.C. § 78aa*]. Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Eastern District of Pennsylvania and elsewhere, and were affected, directly or indirectly, by making the use of the means, instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

## THE DEFENDANTS

12.     **Defendant John T. Place** ("Place"), age 51, is a resident of Brooklyn, New York. Place was the Chief Executive Officer and managing member of GTS, LLC during the relevant period, as well as a registered representative of GTS, Inc. At all times relevant to this action, Place worked at GTS's Newtown Square, Pennsylvania office and held Series 7 and 63 securities

licenses.  Place refused to appear and answer questions in response to the Commission's investigative subpoena.

13.      **Defendant Paul G. Kirk** ("Paul Kirk"), age 56, is a resident of Philadelphia, Pennsylvania.  Paul Kirk was the General Counsel and Chief Operating Officer of GTS, LLC, as well a registered principal of GTS, Inc. with supervisory responsibility over GTS's Newtown Square, Pennsylvania office.  He joined GTS in August 2006 and subsequently obtained his Series 7, 24 and 63 securities licenses.  Paul Kirk asserted his Fifth Amendment right against self-incrimination in response to all of the substantive questions posed by the Commission staff during the Commission's investigation.

14.      **Defendant John P. Kirk** ("John Kirk"), age 50, is a resident of Philadelphia, Pennsylvania.  John Kirk was the President and a member of GTS, LLC during the relevant period, as well as a registered representative of GTS, Inc.  John Kirk and Paul Kirk are brothers.  For all or nearly all of the relevant period, John Kirk worked at GTS's Newtown Square, Pennsylvania office.  He held Series 6, 7, 26 and 63 securities licenses and previously worked for a registered broker-dealer from August 1991 to April 2003.  John Kirk also asserted his Fifth Amendment right against self-incrimination in response to all of the substantive questions posed by the Commission staff during the Commission's investigation.

15.      **Defendant Global Transition Solutions, Inc.** ("GTS, Inc.") is a Wisconsin corporation with a principal place of business in Newtown Square, Pennsylvania.  It is, on information and belief, currently dormant.  From January 1988 to November 2014, GTS, Inc. was a registered broker-dealer.  It voluntarily withdrew its registration in November 2014, following the termination of its business relationship with GTS, LLC.  In 2012, GTS, Inc. and another individual settled administrative charges with FINRA arising from GTS, Inc.'s improper

4

sharing of transition-related commissions and fees with an unregistered entity, GTS, LLC.  In connection with the conduct described below, GTS, Inc. and GTS, LLC operated as a single business enterprise.

16.     **Defendant Global Transition Solutions, LLC** ("GTS, LLC") is a Delaware limited liability company with a principal place of business in Newtown Square, Pennsylvania. It was formed in July 2004 primarily by Place and John Kirk.  At the outset, Place and an entity controlled by John Kirk held 49.5% and 48.5% of GTS, respectively.  GTS, LLC is not, and never has been, registered with the Commission.  It is, on information and belief, currently dormant.  Defendant GTS, Inc. and Defendant GTS, LLC operated jointly as a single business enterprise simply called "Global Transition Solutions" or "GTS."  Many of the individuals and customers with whom GTS did business, including some of GTS's own employees, did not know that defendant GTS LLC and defendant GTS, Inc. were, in fact, two separate legal entities.  All references herein to "GTS" refer to both GTS, LLC and GTS, Inc.

## OTHER RELEVANT ENTITIES

17.     **ConvergEx Global Markets Limited ("ConvergEx")** was a Bermuda-based broker-dealer and a wholly-owned subsidiary of ConvergEx Group, LLC.  ConvergEx was regulated by the Bermuda Monetary Authority until 2012 when it voluntarily relinquished its securities license.  In December 2013, ConvergEx settled the Commission's claims against it in an administrative proceeding, *see* SEC Rel. No. 34-71128 (Dec. 18, 2013), and entered a guilty plea in the United States District Court for the District of New Jersey to one count of conspiracy to commit wire and securities fraud and one count of wire fraud in a parallel criminal proceeding instituted by the United States Department of Justice.  *See United States v. ConvergEx Group, LLC*, District of New Jersey Case No. 2:13-cr-00811.  The SEC settlement and the criminal

guilty plea arose from ConvergEx's participation in a fraudulent scheme to conceal from brokerage customers the practice of regularly charging hidden mark-ups and mark-downs on securities transactions.  GTS routed customer trades to ConvergEx from 2006 until 2011.

18.     **Routing Broker 1** is a registered broker-dealer with a principal place of business in Winter Park, Florida.  GTS routed customer trades to Routing Broker 1 between 2007 and 2009, and then again between 2011 and 2013.

19.     **Routing Broker 2** is a registered broker-dealer and is headquartered in New York City, New York.  GTS routed customer trades to Routing Broker 2 for execution from 2013 through the cessation of GTS's operations in February 2014.

## STATEMENT OF FACTS

### I.     AN OVERVIEW OF THE GTS FRAUD

20.     During the relevant period, October 2006 through February 2014, the defendants engaged in a fraudulent scheme to conceal from their customers and prospective customers their practice of reaping undisclosed proceeds by collaborating with routing brokers to charge mark-ups or, depending on the transaction, mark-downs on trades of equity and fixed-income securities executed on their customers' behalf.  (Hereafter, mark-ups and mark-downs are referred to simply as "mark-ups.")

21.     GTS offered transition management brokerage consulting services, which in this case involved assisting customers in handling large orders to buy and sell equity and fixed-income securities for investors that were, for example, changing fund managers or investment strategies.  Absent active transition management, such orders can, simply because of their size and volume, negatively impact the market for the relevant securities, causing a material decrease

in the value of the portfolio. Pension fund and other large investors use transition management services to minimize risks and to preserve the value of their portfolios.

22.     GTS provided transition management services mostly to public pension funds, including numerous retirement funds held for the benefit of municipal employees, such as retirees from police and fire departments. During the relevant time period, GTS provided transition management services to over 100 customers. While a handful of GTS's customers were located outside of the country, the vast majority were based and physically located within the United States.

23.     Because one of the primary purposes of transition management is to minimize the costs of executing large orders, the costs and fees associated with executing such trades were a matter of exceptional importance to GTS's customers and prospective customers. Indeed, in communicating with current and potential customers, the defendants repeatedly emphasized GTS's limited and supposedly transparent fee structure. Further, many of GTS's customers specifically inquired about GTS's fees before agreeing to utilize its services. The boards of directors of customer pension funds frequently considered GTS's fees when selecting a transition manager.

24.     Before executing a typical transition, GTS entered into an agreement with the customer that authorized GTS to act on the customer's behalf and in the customer's name – for example, to open trading accounts and place orders to carry out the transition.

25.     GTS then placed the customers' buy or sell orders by directing another broker – called the "routing broker" – to execute the trade. As described further below, the defendants used a small number of routing brokers based in the United States (Routing Broker 1 and Routing Broker 2) and Bermuda (ConvergEx) with which GTS had a commission sharing

arrangement.   Although ConvergEx was a Bermuda-based broker, GTS personnel frequently communicated with ConvergEx sales traders permanently located in New York when discussing customer trades and revenue sharing arrangements.  The chief executive officer of ConvergEx was also located in New York.  Each of the routing brokers either executed the trades themselves or executed the trades through local brokers in the market appropriate for the securities.  For example, ConvergEx executed trades for domestic securities through U.S. brokers.

26.    The majority of the securities traded in relevant transitions were domestic securities – for example, approximately $6.8 billion of the $8.8 billion traded through ConvergEx – and were executed by U.S. broker-dealers.

27.    The routing brokers, engaging in riskless principal transactions, imposed mark-ups on the trades.  GTS then shared in the revenue those mark-ups created, even though it told its customers that it was compensated solely from stated, fully disclosed commissions.  GTS derived the majority of its revenues from these undisclosed mark-up proceeds, with the individual defendants collecting millions of dollars in salary and other benefits.

28.    Place, John Kirk and Paul Kirk jointly orchestrated the scheme by approving and communicating false and misleading statements to GTS's customers as to GTS's revenue and business model.  Place and GTS also worked directly with the third party routing brokers to impose the hidden mark-ups on customer trades, which were taken opportunistically depending on the defendants' perception of the customer's sophistication and price sensitivity.  In other words, the defendants calibrated and manipulated the amount of secret mark-ups in order to maximize the revenue they received, while at the same time avoiding detection.

29.    These mark-ups inflated the transition costs for the defendants' customers and created a pool of revenue that defendants and the routing brokers shared.  The defendants misled

their customers regarding this practice while at the same time purporting to act as their customers' fiduciary.

30.     Throughout the scheme, the defendants induced their customers to use – and, in some instances, continue to use – GTS to handle their transitions through a variety of misleading and false statements as to GTS's fees and other aspects of its trading process.  The defendants misled customers through GTS's marketing materials, GTS's transition management agreements, as well as in defendants' responses to customer questions and formal requests for information.

31.     As detailed below, the defendants knew that GTS shared in undisclosed mark-ups when they entered into transition management agreements with customers, many of which explicitly stated, in a the fiduciary provisions of the agreement, that GTS would not receive revenue other than stated commissions.  Moreover, even though customer agreements stated that GTS agreed to act as a fiduciary, the defendants never affirmatively disclosed the mark-up revenue or the conflict of interest it created.

32.     Once a customer decided to use GTS, the defendants continued their deception through misstatements in the pre-trade reports that they prepared for customers, which projected the total cost of an upcoming transition.  Broadly, such reports disclosed two types of anticipated trading costs: (a) "stated" or "explicit" costs, such as brokerage fees and taxes and included GTS's commission, and (b) other "implicit" or variable costs associated with the transition, such as costs arising from the market impact of the proposed trade, the timing of the trade or, when dealing in foreign securities, the fluctuating relative values of the currencies involved.  As described below, the defendants sometimes overstated the anticipated implicit costs to make it easier to conceal mark-ups.

33.     The pre-trade reports disclosed only a modest explicit fee to GTS, corresponding to the fee disclosed in the relevant customer agreements, but the defendants failed to disclose that GTS also intended to receive additional revenue, and that such revenue was buried in the estimated "implicit" costs.

34.     After the trade was executed, the defendants continued their obfuscation through the post-trade reports they prepared, which understated GTS's fees by omitting the mark-up revenue GTS received from the routing broker and overstated the implicit, variable costs related to market forces in order to conceal the secret mark-ups.  To provide credibility to these false reports, Place and GTS often prepared "stories" for their customers about market behavior on the day of trading in order to justify the losses in value to a customer's portfolio which were actually the direct result of the secret fees GTS took from the customer.  The defendants also employed these post-trade reports to help persuade current customers to award GTS new business.

35.     At times, the defendants also attempted to disguise the secret revenue they received from the routing brokers by creating and submitting for payment to the routing brokers invoices for trade cost analysis services performed by GTS.

II.     THE DEFENDANTS MADE MISREPRESENTATIONS TO CUSTOMERS WHILE SECRETLY SHARING MARK-UPS WITH CONVERGEX: 2006-2011

a.     The Defendants and Convergex Conspired to Impose Mark-ups, Shared Revenues, and Concealed Payments

36.     In 2005, GTS began to utilize a predecessor-in-interest to ConvergEx to serve as routing broker for its customers' transitions, and in February of 2005, GTS signed a "Commission Sharing Arrangement" with ConvergEx's predecessor-in-interest.  The agreement stated that GTS would share in "fees" and "riskless principal mark-ups/mark-downs" in connection with transactions "effected by or through [ConvergEx's predecessor-in-interest] on

behalf of customers referred by GTS." From at least 2006, the defendants began to coordinate with ConvergEx, which had by then been spun off as a separate business entity, to impose and share mark-ups on GTS's customers' orders, while at the same time concealing such revenue from GTS's customers.

37.    During the period that GTS routed transition events to ConvergEx, Place frequently conferred with ConvergEx traders to decide how much mark-up to impose pursuant to the Commission Sharing Agreement. In numerous recorded calls with those traders, Place emphasized that the amount of mark-up – and resulting revenue for GTS and ConvergEx – depended on the customer's expectations, "sensitivity" to costs, and perceived vigilance. For example, in an April 3, 2011 call between Place and a ConvergEx trader, Place noted that:

> I have a broker order will be to you within an hour and I haven't
> looked at it myself other than to instruct [another ConvergEx
> employee] and my people internally to widen some spreads so that
> we can – we can get aggressive with this particular situation. . . .
> This particular situation is one that the expectations have been set
> and it's an opportunity for you and I to get a little more aggressive
> but within reason.

38.    Calls on July 3 and 27, 2011 featured similar discussions. In the latter, Place and the ConvergEx trader discussed a customer's "sensitivity level," while Place mused that GTS and ConvergEx could impose a larger mark-up "if I could tell a story or if there's room within that pre-trade." Place and the trader ultimately agreed that they would "be able to do well and run it up to a reasonable [amount] – and have a reasonable story."

39.    On another occasion, May 17, 2011, Place and John Kirk telephoned a different ConvergEx trader to discuss a potential upcoming trade. During the call, Place and John Kirk openly complained about the customer's request for "time-stamped" trade data, which would provide the customer with the actual price at which their securities traded on the market and

thereby indirectly reveal the mark-ups taken, if mark-ups were taken, and potentially reveal their scheme. Place's and John Kirk's comments demonstrate that they understood that the mark-ups were not otherwise disclosed to the client and that GTS could not share in the mark-ups if there was a chance that the client might learn of the practice. Notwithstanding the concerns about "time-stamped" trade data, John Kirk assured the ConvergEx trader that the transition event's massive size made it still worth doing, even without the mark-ups: "frankly, your firm and our firm, we can still work off the stated [commission] on a $400 million deal and make a couple bucks."

40.     Banking and trading records confirm that the defendants and ConvergEx shared undisclosed revenue. For example, an internal ConvergEx spreadsheet summarizing revenues shared with GTS on a transaction by transaction basis from 2007 through 2011 reflects that, for trades executed by ConvergEx on behalf of GTS in August 2011, ConvergEx shared $178,184 in mark-up revenue with GTS. A September 2011 bank statement for GTS's account correspondingly shows that GTS received a wire from ConvergEx in the amount of $178,184 with the descriptor "August 2011 GTS TCA Fees."

**b.      *The Defendants Used a False invoicing Scheme to Facilitate Payment of the Mark-ups to GTS.***

41.     The defendants further concealed the practice of sharing mark-up proceeds with ConvergEx by attempting to create the false appearance that ConvergEx, separate from its trading relationship with GTS, purchased trade cost analysis, or "TCA," from GTS, when in fact ConvergEx neither requested the service nor used it. To facilitate the charade, each month ConvergEx sent GTS trading data to GTS, and GTS returned a TCA report to ConvergEx. On information and belief, GTS issued invoices to ConvergEx to collect the amounts that were actually due to GTS under its revenue sharing arrangement with ConvergEx. While GTS did

perform some trade analysis, the TCA invoices to ConvergEx – often for hundreds of thousands of dollars per month – tracked almost exactly GTS's share of the undisclosed mark-up proceeds.

42.     The use of bogus TCA invoices to conceal ConvergEx's payment of additional commissions to GTS was an open secret among defendants and ConvergEx personnel.  In a January 20, 2011 email from ConvergEx's general counsel to other ConvergEx employees, the general counsel wrote that he had spoken with Paul Kirk and Place and that the "invoices are a mechanism to collect the rebate monies we agreed to pay them in the rebate agreement."

43.     Ultimately, the parties abandoned the fiction as unnecessary, and in a recorded call to a ConvergEx trader, Place stated: "We're not gonna pretend it's something it's not …this was all initiated by…my firm originally…just to…look like there was more spirit of [expletive] going on…."

44.     Paul Kirk was responsible for sending most or all of the bogus TCA invoices to ConvergEx.  For example, on October 31, 2008, he sent an invoice to ConvergEx for $185,608.  The invoice contained no detail; it simply stated that the money due was the "[f]ee for October 2008 trade cost analysis."  Later, Paul Kirk also sent similar bogus TCA invoices to Routing Broker 1.

45.     Prior to issuing the TCA invoices, Paul Kirk had recurring monthly calls with ConvergEx personnel to reconcile the TCA invoices against GTS's share of the mark-up proceeds taken on the transitions ConvergEx handled for GTS.

46.     When Paul Kirk sent TCA invoices to ConvergEx, he would routinely carbon copy John Kirk and Place on the email.  For example, on January 3, 2011, Paul Kirk sent two TCA invoices to ConvergEx, for nearly $170,000 combined, carbon copying Place and John Kirk.

c.   *The Defendants Made Misrepresentations to Customers About the Revenues They Received From Transition Events Handled by ConvergEx*

47.   While GTS worked with ConvergEx to impose undisclosed mark-ups and share in the resulting proceeds, the defendants continued to falsely inform customers that GTS would receive only the commissions set forth in the written agreement between GTS and the customer. For example, on September 23, 2010, Paul Kirk signed a Brokerage Consulting Agreement with a municipal police and firefighters' pension fund.  In this agreement, GTS agreed that it would be paid *only* the stated commissions set forth in the agreement:

4.   Compensation:  Client and GTS hereby acknowledge that the [Broker of Record] will charge stated commissions per asset class as follows:

| Asset Class | Maximum Stated Commissions |
|---|---|
| Domestic Equity | $.015 per share (1.5 cents) |
| Domestic Fixed Income | .05% (5 basis points) |
| International Equity | .05% (5 basis points) |
| International Fixed Income | .05% (5 basis points) |

[Broker of Record] will remit a portion of the commission/fees to GTS and disclose this arrangement on each confirmation it generates for Client's account.  *Any and all compensation shall be fully disclosed to Client.*

. . . .

8.   GTS as Fiduciary:  GTS acknowledges that it is a fiduciary with respect to the Client and a named fiduciary within the meaning of Section 112.656(2), Florida Statutes, and shall comply with all federal and state securities laws and regulations, including, but not limited to, the Investment Company Act of 1940.  *As a fiduciary, GTS agrees that it does not and will not make any revenue of any kind other than its share of the explicit commissions referred to in paragraph 4 above.*

48.   The September 23, 2010 contract was part of an established pattern.  For example, on November 19, 2009, Paul Kirk signed a transition management agreement with a municipal

14

employee retirement fund that stated: "Any and all compensation shall be fully disclosed to Client." It further stated that, "[a]s a fiduciary, GTS agrees that it does not and will not make any revenue of any kind other than its share of the explicit commissions referred to in paragraph 4 above."

49.     The representations by GTS and Paul Kirk were false. As Paul Kirk and the other defendants well knew, GTS intended to and did receive significant additional revenue from ConvergEx from this transition. Specifically, for this transition, GTS received fees totaling approximately $38,000, which were $27,000 in excess of the commission rate stated in the customer's agreement.

50.     GTS entered into transition management agreements with customers, many of them signed by Paul Kirk, with substantially similar misstatements – in essence, that GTS's commissions and revenues would be limited to stated, explicit commissions – on at least 14 other occasions throughout the relevant period. Each of those agreements was with U.S.-based funds, and each was executed in the U.S.

51.     Place and John Kirk also sent marketing pieces to customers and prospective customers regarding the transition services GTS provided and the fees it charged. For example, on August 27, 2009, Place sent to a prospective customer GTS marketing material, which falsely described its services as follows:

> GTS has eliminated all conflicts of interest inherent in the traditional institutional brokerage industry. . . .
>
> GTS contractually agrees that it makes *no money of any kind other than the explicit fee (i.e. commissions) associated with a trading event*, thereby removing the conflict of interest predominating executing broker dealers who can generate additional monies from the order flow.

52.     On March 10, 2009, John Kirk also sent false marketing material to a prospective customer, which likewise falsely assured customers that GTS "makes no money of any kind other than the explicit fee (i.e. commissions) associated with a trading event."

53.     Place, John Kirk and GTS also provided false and misleading post-trade reports to customers. As one example, on November 17, 2009, John Kirk sent a post-trade report to a municipal pension fund customer, carbon-copying Place. John Kirk's summary of the "actual performance" did not disclose that the performance was the result, in large part, of mark-ups that the defendants and ConvergEx imposed. The post-trade report concealed those mark-ups by falsely describing them as "Implicit Costs" such as "Market Impact" and "Timing Cost."

54.     In fact, the mark-ups allowed defendants to take approximately $135,000 in undisclosed revenue on the customer's transition – more than three times GTS's stated commissions.

**III.   THE DEFENDANTS MADE MISREPRESENTATIONS TO CUSTOMERS WHILE SECRETLY SHARING MARK-UPS WITH ROUTING BROKER 1: 2007-2009**

55.     From 2007 to 2009, while it was also using ConvergEx, GTS employed Routing Broker 1 to execute the transitions it was retained to manage. For the transitions executed by Routing Broker 1, too, the defendants affirmatively lied to customers and prospective customers about the fees GTS charged to manage the customers' transition events, likewise falsely informing customers that the defendants would not receive "any commissions or fee sharing whatsoever" from the brokers which executed the transition.

**a.     The Defendants and Routing Broker 1 Shared Revenues**

56.     On September 22, 2006, in a contract entitled "Commission Sharing Agreement for Referrals," GTS and Routing Broker 1 agreed to "share commissions, commission equivalents, riskless principal mark-ups/mark-downs, and other fees as a referral fee . . . with

16

respect to certain past and future securities transactions." The contract was signed by Place and another individual, and it was addressed to the attention of both John Kirk and Paul Kirk.

57.     Between 2007 and late 2008 or early 2009, GTS routed certain transitions to Routing Broker 1, which, at the direction of Place and GTS, created undisclosed revenues by imposing mark-ups on many of GTS's customer transitions. As with ConvergEx, which GTS also used during this period, Place coached Routing Broker 1 on specifically how much to mark-up the customers' trades.

58.     As provided in the agreement between GTS and Routing Broker 1, and as confirmed by trading and bank records, GTS received a portion of the revenue created by mark-ups Routing Broker 1 imposed. Specifically, whereas GTS only should have received stated commissions, bank and other records show that GTS received revenue in excess of stated commissions.

59.     For example, on December 20, 2008, GTS handled a transition for a customer involving the liquidation of approximately $37 million of domestic equity securities. GTS used Routing Broker 1 to liquidate the customer's portfolio. Although the stated commission in the post-trade report for the liquidation disclosed a $12,772 commission, consistent with the rate in the customer's agreement with GTS, Routing Broker 1 imposed a mark-up of approximately $67,780 and shared approximately $31,761 of that amount with GTS. Internal Routing Broker 1 records and GTS bank records confirm that $31,761 was wired to GTS in connection with the transaction.

### b.     *The Defendants Made Misrepresentations to Customers About the Revenues They Received From Transition Events Handled by Routing Broker 1*

60.     While GTS worked with Routing Broker 1 to impose undisclosed mark-ups and share in the resulting proceeds, it repeatedly told customers and potential customers that it earned only the stated commissions. For example, on June 26, 2007, Place signed a Transition Management and Brokerage Consulting Agreement with a municipal firefighters' pension fund.

The agreement falsely represented to the pension fund that GTS would not receive any fees "whatsoever" other than the "stated commissions" set forth in a table in the agreement:

> Client hereby acknowledges that GTS, in implementing the aforementioned strategy, will utilize one or more pre-qualified and certified brokers ("Executing Brokers") to implement the Transition in an orderly manner. . . . *GTS does not receive any commissions or fee sharing whatsoever from the Executing Broker(s).* . . .

61.     In this agreement, Place also affirmed that GTS would have the best interests of the customer at all times in mind:

> Throughout the term of this Agreement, GTS shall act within the guidelines of a fiduciary on behalf of the client, as provided for in the investment Company Act of 1940.

62.     On December 5, 2007, at GTS's request, Routing Broker 1 executed a transition for the municipal firefighters' pension fund involving trading approximately $56 million in domestic equity securities.  GTS delivered a pre-trade report to the customer forecasting explicit costs of approximately $23,000 (consistent with the 1.5 cents per share commission rate agreed in the Transition Management and Brokerage Consulting Agreement) and implicit costs totaling approximately $292,000.  Notwithstanding the pre-trade forecast and the agreed commission rate, GTS bank records and internal Routing Broker 1 financial records, confirm that 0.5 cents per share was paid to the executing broker and approximately 4.5 cents per share was shared equally between Routing Broker 1 and GTS (approximately $35,000 each).  On the post-trade report delivered to the customer by GTS on January 3, 2008, however, GTS falsely reported that explicit costs for the transition were approximately $23,000 (consistent with the pre-trade estimate) and that implicit costs ("Market Impact" and "Timing Cost") totaled approximately $155,000.

63.     On December 14, 2009, Paul Kirk signed an addendum to the June 26, 2007 agreement discussed above, "incorporating by reference" the terms, and the misstatements, in the earlier agreement to cover a second transition planned for later in the month.  Paul Kirk never corrected any of the misstatements contained in the earlier agreement.

64.     The defendants made similar representations in response to requests for information ("RFI's") from potential clients and their consultants.  On May 5, 2008, GTS sent a response to an investment consultant's questionnaire stating that "GTS' revenue is based solely on the stated commissions.  GTS guarantees this in our written contract."  GTS identified John Kirk as the GTS representative to whom the customer should pose any questions regarding the defendants' representations.

65.     On the same day, GTS responded to another investment consultant's questionnaire, which similarly stated that "[p]erformance based and profit sharing arrangements do not align our interests as a fiduciary with those of our clients [sic]."  Again, John Kirk was identified as the "contact" for GTS's response.

66.     Both of these consultants represented prospective GTS clients.

67.     John Kirk routinely reviewed and approved GTS's responses to customer RFIs, including one dated October 20, 2008, which falsely stated: "GTS does not receive any other fee or economic benefit other than the stated commission on our contract" and "[t]here are no additional sources of compensation or benefit to GTS."

68.     During this period, GTS sent Routing Broker 1 false invoices purportedly for TCA reports in amounts that included GTS's share of the mark-ups taken by Routing Broker 1.  For example, GTS sent Routing Broker 1 an invoice dated August 20, 2009 for $110,832.06, ostensibly for "June 2009 trade cost analysis."   However, as confirmed by banking and other

records, the $110,832.06 is GTS's portion of the shared revenue derived from transitions Routing Broker 1 handled for GTS in June 2009.

69.     In 2009, the defendants ceased using Routing Broker 1 for transitions and used ConvergEx exclusively until 2011.

## IV.   THE DEFENDANTS CONTINUED TO MAKE MISREPRESENTATIONS TO CUSTOMERS WHILE SECRETLY SHARING MARK-UPS WITH ROUTING BROKER 1: 2011 TO 2013

70.     Starting in approximately 2011, the defendants moved GTS's business back to Routing Broker 1, which it used until approximately January 2013.

71.     During this period the defendants continued to share in the mark-ups taken by Routing Broker 1 on GTS's customers' transition transactions and failed to disclose the fees to customers.

### a.     The Defendants and Routing Broker 1 Re-Commenced the Sharing of Mark-Ups

72.     GTS and Routing Broker 1 entered into an Execution Cost Management Services Agreement ("ECMSA") on December 12, 2011.  Paul Kirk signed it for GTS.  The ECMSA stated that Routing Broker 1 would pay GTS for GTS's TCA review and other analyses, with payments supposedly tied to a Market Fee Schedule, organized by country.  The ECMSA gave Routing Broker 1 discretion to determine which "markets it wishes to be analyzed each month." For example, GTS's stated TCA fee to analyze data from US trades would purportedly cost $10,000 per month, while analyzing data from trades in Austria would purportedly cost $15,000 per month, and so on.  In practice, however, GTS and Routing Broker 1 chose the countries to be analyzed based on the amounts due under the mark-up sharing arrangement – essentially backing into the specific countries based on the trading revenue to be shared on prior transitions.  For example, in July 2012, Paul Kirk wrote an email to Routing Broker 1, copying John Kirk and

John Place, in which he recounted the manner in which TCA payments had been made in prior months, notably omitting any mention of countries or a calculated fee, and instead describing a business negotiation apparently focused on total dollar amounts:

> It was subsequently decided between [a Routing Broker 1 executive] and John Place that TCA would be provided for the months of February, March and April for the total cost of an additional $300,000. That additional $300,000 was paid in three installments of $150,000, $75,000 and $75,000 respectively.

73.     Even when particular countries were discussed, the correspondence between the defendants and Routing Broker 1 demonstrates that the specific countries were selected to justify the amounts of revenue sharing owed by Routing Broker 1 to GTS. For example, in an email exchange between John Kirk and a senior Routing Broker 1 employee, in October 2012, on which John Place and Paul Kirk were copied, John Kirk listed the countries for which TCA analysis should be performed for August and September. The senior Routing Broker 1 employee wrote: "As per John Places' discussion with [a Routing Broker 1 executive], the TCA for August should be $75K and the TCA for Sept should be $150K." John Kirk responded, "OK that's fine …we will simply switch the country list and run the report accordingly."

74.     The close relationship between the total payments made by Routing Broker 1 to GTS for TCA and the total amount of revenue sharing further reinforces that the TCA invoices were a pretext. Although the monthly invoices varied over time, the sums match the amount of revenue GTS was owed for the trading it routed to Routing Broker 1 based on the 50/50 split they had previously employed. In 2012 overall, the amount GTS received for TCA services and the calculated amount of shared revenue due to GTS were within 3% of each other.

75.     Place and John Kirk directly participated in negotiating and drafting the revised Commission Sharing and TCA Agreements. As a senior Routing Broker 1 employee put it in an

internal, August 23, 2012 email, "I think both Johns are going to join me in NY for the Monday meeting on CSA [Commission Sharing Agreement] or brainstorming on alternatives to TCA."

76.    On November 30, 2012, GTS and Routing Broker 1 negotiated a commission Sharing Agreement that was to "replace in its entirety" their 2006 agreement, which had controlled the sharing of profits.  In the proposed 2012 Agreement, GTS and Routing Broker 1 agreed upon a "pricing schedule" that provided for a potential mark-up range based upon trading performance relative to two market benchmarks.  Although it is uncertain whether this agreement was finalized, the conduct of GTS and Routing Broker 1 reflected a clear intent to continue their prior revenue sharing.

### b.    The Defendants Continued to Make Misrepresentations to Customers Regarding Their Compensation for Transition Events

77.    Following the start of the Commission's investigation of ConvergEx in August 2011, GTS began to modify the disclosures in some – but not all – of its customer contracts.  These new disclosures suggested that it was possible that "parties" involved in the transition event "may" make or receive "various payments attendant to the trading process," including, among others, "mark-ups…consistent with best execution" that might be incurred or paid "in the pursuit of best execution."  Following a litany of potential sources of trading costs and revenue, these disclosures assured GTS's customers that they would receive a "complete" post-trade report disclosing "all costs" and further stating that "under no condition" would the client incur "undisclosed costs or fees."

78.    Specifically, the new disclosure language, as set forth in a November 2012 agreement between GTS and a state public retirement system, stated:

> [I]n pursuing best execution of all trades for the Client and as part of completing each transition according to the recommended trade strategy and in light of market conditions in existence at the time

of the transaction, *the parties servicing Client throughout the transition event may make and receive various payments attendant to the trading process.* These costs and payments include but are not limited to markups or markdowns of securities consistent with best execution, commissions from parties on the other side of trades, fees from order flow from electronic trading networks and other sources and other possible expenses and remuneration, all of which are incurred and paid in pursuit of best execution. * * * Upon the completion of each transition event GTS will provide Client a complete Post Trade Report (along with trade confirmations) reflecting in the net performance analysis all costs to the client and the performance of the executing broker contrasted against multiple industry benchmarks together with GTS's in-person or telephonic analysis of same. *Under no condition will Client ever incur any undisclosed costs or fees.*

79. These new disclosures made no reference to GTS, nor did they mention GTS's practice of regularly sharing in mark-ups taken by Routing Broker 1. Indeed, while GTS noted that "parties servicing client ... *may* make and receive various payments," the defendants knew that this statement was false, as they fully expected, at the time that they made and disseminated this statement to multiple customers, that GTS *would* receive such payments in much the same manner that it had done so with ConvergEx and with Routing Broker 1 in the past. On information and belief, GTS and the defendants knew that the real purpose of the ECSMA TCA arrangement between GTS and Routing Broker 1 was to provide a means for Routing Broker 1 to share trading revenue with GTS. They understood and expected that Routing Broker 1 would make TCA payments to GTS under the agreement in consideration of the order flow that GTS sent to Routing Broker 1.

80. On information and belief, the defendants also knew that the promise in the disclosures to provide customers with "complete" post-trade reports disclosing all costs and fees was highly misleading. While GTS's post-trade reports accurately disclosed the net loss in value to customers' portfolios after a transition event was complete, and therefore the secret mark-ups

23

may have been literally "reflected in the net performance analysis," the new disclosures as a whole (particularly when read together with GTS's written promise to act as the customer's fiduciary) created the false impression that GTS would disclose specifically all known costs and fees to the customer. In practice, when GTS provided customers with post-trade reports, they did not disclose the nature or amount of any of the "various payments" they received. Instead, they continued to conceal the additional revenue they received in the "implicit" costs incurred during the transaction.

## V.   THE DEFENDANTS MOVE THEIR BUSINESS TO ROUTING BROKER 2 BUT CONTINUE TO MAKE MISREPRESENTATIONS TO CUSTOMERS: 2013 TO 2014

81.   GTS's relationship with Routing Broker 1 eventually deteriorated, and in 2013, the defendants began to use Routing Broker 2, where one of GTS's former employees then worked as a trader.

82.   The defendants' scheme of sharing in undisclosed revenue continued with Routing Broker 2.

### a.   The Defendants and Routing Broker 2 Also Share Mark-ups

83.   Although GTS and Routing Broker 2 do not appear to have entered into a formal revenue sharing agreement, they did impose mark-ups and share the resulting revenue. Moreover, in a March 18, 2013 email exchange between Place, John Kirk, Paul Kirk and a Routing Broker 2 executive, John Kirk sought to "confirm the payment procedure we discussed and agreed upon last week," and then detailed that procedure. The Routing Broker 2 executive responded: "Agreed, thx." A trader for Routing Broker 2 confirmed in investigative testimony that the payment procedure described in the March 18, 2013 email was consistent with actual practice.

84.     Wires between GTS and Routing Broker 2 further demonstrate that the defendants' scheme continued.  For example, on February 19, 2014, Routing Broker 2 wired $79,404.83 to GTS in connection with a transition for a municipal pension plan.  That amount exceeded the stated commissions by approximately $60,000.

### b.     *The Defendants Also Continued to Make Misrepresentations to Customers*

85.     During this time, the nature of the defendants' misrepresentations stayed largely the same.  For example, GTS's December 2012 contract with a municipal customer, which governed the customer's February 2014 transition event, contained the modified disclosure language described above, but made no mention of the specific revenue arrangements between GTS and Routing Broker 1 or Routing Broker 2.  The December 2012 contract also stated that GTS would act "within the guidelines of an independent fiduciary on behalf of Client."

86.     GTS also promised the municipal pension fund customer that it would provide "a complete Post Trade Report . . . reflecting in the net performance analysis all costs to the client....  Under no condition will Client ever incur any undisclosed costs or fees."

87.     GTS's statement in the 2012 contract that it "may make and receive various payments" was materially misleading given the revenue sharing arrangement between GTS and Routing Broker 2, pursuant to which defendants expected that it would necessarily receive such payments.

88.     Moreover, when GTS provided the customer a post-trade report in February 2014 the defendants failed to disclose the "implicit costs" for the transaction included mark-ups taken by Routing Broker 2 and shared with GTS.

## VI.   The Defendants' Misrepresentations Were Material

89.     A primary purpose of transition management is to minimize costs.  As the defendants well knew and as many of GTS's customers have confirmed, GTS's supposedly limited and transparent fees were an essential feature of the transition agreement.   For example, in a proposal GTS sent to a potential customer in June 2012, GTS acknowledged that "[m]inimiz[ing] trading costs and market risks associated with the sale" was a "primary objective" of the customer.

90.     The defendants' affirmative misrepresentations and omissions regarding the mark-ups and revenue sharing GTS received (and fully expected to receive) from the routing brokers – particularly in light of the defendants' claims that they served as their customers' fiduciary – goes to the core of what investors hired GTS to do: protect the customer's assets by keeping costs as low as possible.  Indeed, the defendants' undisclosed and illicit proceeds often exceeded the stated commissions by a factor of three or four.  The defendants' misrepresentations and omissions here were, therefore, material.

91.     Moreover, the defendants knew that their customers and prospective customers made the decision to employ GTS as a result of the defendants' representations.  For example, Place, John Kirk and Paul Kirk were all forwarded a January 2007 email wherein a customer insisted that the defendants specifically avow that GTS earned no "fees from revenue sharing," and required the defendants to "furnish the Client with a written statement reporting all of the fees and commissions that GTS has received in connection with [its transition management for the customer] and . . . remit . . . excess commissions and fees."  Despite this email, GTS ultimately received additional trading revenue on this deal, which defendants failed to disclose to the customer.

**VII.   THE DEFENDANTS KNEW OR WERE RECKLESS IN NOT KNOWING THAT THEY WERE MAKING MATERIAL MISREPRESENTATIONS, OMITTING MATERIAL FACTS, AND WERE ENGAGED IN DECEPTIVE CONDUCT.**

92.     As one of GTS's founders and controlling persons, Place had direct knowledge that GTS – typically Place himself – collaborated with routing brokers to impose mark-ups on GTS's customers' transactions and shared in the proceeds, and the defendants and others under their direction and control falsely told customers that GTS made no revenue besides the stated, disclosed commissions.

93.     Place also knew that GTS manipulated its pre-trade and post-trade reports to conceal the mark-ups GTS shared with the routing brokers, and he knew that GTS sent its routing brokers invoices for TCA payments, which were designed to conceal the nature of the routing brokers payments to GTS.

94.     John Kirk was senior officer at GTS and was directly involved in all aspects of GTS's business.  Like Place, he knew about – and often made – false claims and material omissions regarding the source of GTS's revenues, while also knowing that GTS had revenue sharing agreements with its routing brokers.  John Kirk also discussed potential mark-ups with a routing broker, and he was aware that the TCA invoices were primarily intended to conceal the nature of payments from the routing brokers to GTS.

95.     The same is true for Paul Kirk, who signed many of the customer contracts containing false statements and material omissions, while at the same time directly managing the sham TCA invoice process – often through monthly calls to routing brokers.

96.     Place and John Kirk and Paul Kirk were each also licensed securities professionals and officers of a firm that purported to act as its customers' fiduciary.  As such,

they had a heightened duty to disclose the hidden mark-ups and revenue and to insure the accuracy of their claims and the various pre- and post-trade reports they sent to customers.

## FIRST CLAIM FOR RELIEF
### VIOLATIONS OF EXCHANGE ACT SECTION 10(B) AND RULE 10B-5 THEREUNDER
### (All Defendants)

97.    The Commission realleges and reincorporates paragraphs 1 through 96 as if fully set forth herein.

98.    With respect to the conduct described above, Defendants Place, Paul Kirk, John Kirk, GTS, Inc., and GTS, LLC, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:

    (a)    employed devices, schemes, or artifices to defraud;

    (b)    made untrue statements of material fact or omissions to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or

    (c)    engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit.

99.    By reason of the actions alleged herein, Defendants Place, Paul Kirk, John Kirk, GTS, Inc., and GTS, LLC each violated Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*] and unless restrained and enjoined will continue to do so.

## SECOND CLAIM FOR RELIEF
### VIOLATIONS OF EXCHANGE ACT SECTION 15(C)(1)
### (Defendant Global Transition Solutions, Inc.)

100.    The Commission realleges and reincorporates paragraphs 1 through 96 as if fully set forth herein.

101.    At all relevant times, Defendant GTS, Inc. was a registered broker-dealer pursuant to Section 15(b) of the Exchange Act [*15 U.S.C § 78o(b)*].

102.    With respect to the conduct described above, Defendant GTS, Inc., with scienter, by use of the mails or any means or instrumentality of interstate commerce effected any transaction in, and/or induced or attempted to induce the purchase or sale of, any security by:

(a)    means of a manipulative, deceptive, or other fraudulent device or contrivance; and/or

(b)    made untrue statements of material fact or omissions to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

103.    By reason of the actions alleged herein, Defendant GTS, Inc. violated Section 15(c)(1) of the Exchange Act [*15 U.S.C. § 78o(c)*] and unless restrained and enjoined will continue to do so.

### THIRD CLAIM FOR RELIEF
#### CONTROL PERSON LIABILITY UNDER EXCHANGE ACT SECTION 20(A) FOR VIOLATIONS OF EXCHANGE ACT SECTIONS 15(C)(1) AND 10(B) AND RULE 10B-5 THEREUNDER
#### (Defendants John T. Place, Paul G. Kirk, and John P. Kirk)

104.    The Commission realleges and reincorporates paragraphs 1 through 96 as if fully set forth herein.

105.    Through the conduct described above, GTS, Inc. and GTS, LLC, in connection with the purchase or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would

operate as a fraud or deceit in violation of Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*].

106.   Through the conduct described above, Defendant GTS, Inc., with scienter, by use of the mails or any means or instrumentality of interstate commerce effected any transaction in, and/or induced or attempted to induce the purchase or sale of, any security by:  (a) means of a manipulative, deceptive, or other fraudulent device or contrivance; and/or (b) made untrue statements of material fact or omissions to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

107.   When GTS, Inc. and GTS, LLC violated Sections 15(c)(1) and 10(b) of the Exchange Act and Rule 10b-5, Defendant John Place, Defendant Paul Kirk, and Defendant John Kirk directly or indirectly controlled GTS, Inc. and/or GTS, LLC.  Defendant John Place, Defendant Paul Kirk, and/or Defendant John Kirk were therefore each a "controlling person" within the meaning of Section 20(a) of the Exchange Act [*15 U.S.C. §78t(a)*] with regard to GTS, Inc. and GTS, LLC.

108.   As alleged above, Defendant John Place, Defendant Paul Kirk, and/or Defendant John Kirk were each a culpable participant in, and directly or indirectly induced the acts constituting, GTS, Inc.'s and/or GTS, LLC's violations of the Exchange Act, and did not act in good faith.

109.   By reason of the foregoing, Defendant John Place, Defendant Paul Kirk, and/or Defendant John Kirk are jointly and severally liable with and to the same extent as CGM Limited for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 and, unless enjoined, will again act as a "controlling person" in connection with such violations.

## FOURTH CLAIM FOR RELIEF
### LIABILITY UNDER EXCHANGE ACT SECTION 20(E) FOR
### AIDING AND ABETTING VIOLATIONS OF EXCHANGE ACT SECTIONS 15(C)(1)
### (Defendants John T. Place, Paul G. Kirk, and John P. Kirk)

110.    The Commission realleges and reincorporates paragraphs 1 through 96 as if fully set forth herein.

111.    At all relevant times, Defendant GTS, Inc. was a registered broker-dealer pursuant to Section 15(b) of the Exchange Act [*15 U.S.C § 78o(b)*].

112.    With respect to the conduct described above, Defendant GTS, Inc., with scienter, by use of the mails or any means or instrumentality of interstate commerce effected any transaction in, and/or induced or attempted to induce the purchase or sale of, any security by:

(a)     means of a manipulative, deceptive, or other fraudulent device or contrivance; and/or

(b)     made untrue statements of material fact or omissions to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

113.    By engaging in the conduct described above, defendants John Place, John Kirk and Paul Kirk knowingly and/or recklessly substantially assisted defendant GTS, Inc.'s violations of Exchange Act Section 15(c)(1) in violation of Exchange Act Section 20(e) [*15 U.S.C. § 78t(e)*].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

(i)      finding that each defendant violated the antifraud provisions of the federal securities laws as alleged herein;

(ii)     permanently enjoining each defendant from violating Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*];

(iii)    permanently enjoining Defendant GTS, Inc. from violating Section 15(c)(1) of the Exchange Act [*15 U.S.C. § 78o(c)*];

(iv)     permanently enjoining Defendant John Place, Defendant Paul Kirk, and/or Defendant John Kirk from violating Section 20(a) of the Exchange Act [*15 U.S.C. § 78t(a)*];

(v)      permanently enjoining Defendant John Place, Defendant Paul Kirk, and/or Defendant John Kirk from violating Section 20(e) of the Exchange Act [*15 U.S.C. § 78t(e)*];

(vi)     ordering each defendant to jointly and severally disgorge, with prejudgment interest, all illicit profits or other ill-gotten gains received by any person or entity as a result of the actions alleged herein;

(vii)    ordering each defendant to pay civil monetary penalties under Section 21(d)(3) of the Exchange Act [*15 U.S.C. § 78u(d)(3)*]; and

(viii)   granting such other relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated: August 8, 2016                              Respectfully submitted,

Daniel J Maher (Mass. Bar No. 654711)
Stephan J. Schlegelmilch (Ohio Bar No. 0073088)
*Counsel for Plaintiff*
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549
MaherD@SEC.gov
SchlegelmilchS@SEC.gov
(202) 551-4737 (Maher)
(202) 551-4935 (Schlegelmilch)
(202) 772-9292 (facsimile)

Of Counsel:

Jennifer S. Leete
Ellen F. Bortz
Richard E. Johnson
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549