**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | **CIVIL ACTION** |
| **v.** | **NO. 16-4291** |
| **JOHN T. PLACE, PAUL G. KIRK, JOHN P. KIRK, GLOBAL TRANSITION SOLUTIONS, INC., and GLOBAL TRANSITION SOLUTIONS, LLC** | |

## MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT

Baylson, J.                                                                              February 14, 2019

## I.      Introduction

In this case, the Securities and Exchange Commission ("SEC") alleges that the brokerage firms Global Transition Solutions, Inc. and Global Transition Solutions, LLC (together, "GTS"); John Kirk, GTS, LLC's President; Paul Kirk, GTS's General Counsel and Chief Operating Officer; and John Place, GTS, LLC's Chief Executive Officer, committed securities fraud by misleading current and prospective clients about the true nature of their costs in connection with portfolio transitions.  The Complaint alleges four causes of action under federal securities laws.

1.  **Count I**: Violations of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 against Defendants John Kirk; Paul Kirk; John Place; GTS, Inc.; and GTS, LLC.

2.  **Count II**: Violations of Section 15(c)(1) of the Exchange Act against Defendant GTS, Inc.

3.  **Count III**: Control personal liability under Section 20(a) of the Exchange Act for violations of Exchange Act Sections 15(c)(1) and 10(b) and Rule 10b-5 thereunder against Defendants John Kirk, Paul Kirk, and John Place.

4.  **Count IV**: Liability under Section 20(e) of the Exchange Act for aiding and abetting violations of Exchange Act Section 15(c)(1) against Defendants John Kirk, Paul Kirk, and John Place.

The SEC seeks permanent injunctions against Defendants to enjoin them from engaging in acts, practices, and courses of business alleged in the Complaint; disgorgement of all profits realized from Defendants' unlawful conduct; and civil penalties pursuant to Section 21(d)(3) of the Exchange Act. (ECF 1, "Compl." ¶ 8.)

The SEC has moved for summary judgment on liability on its claims under Sections 10(b) and 20(a) of the Exchange Act against Defendants John and Paul Kirk (together, "the Kirks" or "Defendants")–Counts I and III of the Complaint. There is no Motion for Summary Judgment on the SEC's claims under Sections 15(c)(1) or Section 20(e) of the Exchange Act–Counts II and IV of the Complaint. For the reasons discussed below, the SEC's Motion for Summary Judgment is granted in part and denied in part.

## II.     Undisputed Facts

The Court included a detailed description of the undisputed facts in the Opinion denying Defendants' Motion for Summary Judgment on statute of limitations grounds. (See ECF 67; 2018 WL 6727998, at *1–3 (E.D. Pa. Dec. 21, 2018) (Baylson, J.).) Therefore, the Court refers to the facts within the statutory period–after August 8, 2011–that are summarized in that Opinion, and does not repeat them here.

## III.     Procedural History

On August 8, 2016, Plaintiff SEC filed the Complaint in this Court against Defendants GTS, the Kirks, and Place, alleging that all Defendants violated federal securities laws by failing to disclose all sources of compensation to clients between October 2006 and February 2014. (ECF 1.) The Kirks filed an Answer to the Complaint on April 7, 2017 (ECF 25). The SEC filed a Notice of Dismissal as to Defendant GTS, LLC under Rule 41(a)(1)(A) on April 21, 2017 (ECF 29).

On June 15, 2018, the SEC filed a Consent Motion for Entry of Judgment on Liability against Place (ECF 42), along with the Consent of Place (ECF 43, Ex. 1). That same day, the SEC also filed a Motion for Summary Judgment on liability on its Section 10(b) and 20(a) claims–Counts I and III of the Complaint–against the Kirks (ECF 44, "MSJ"). The Kirks filed an Opposition on August 10, 2018 (ECF 48, "Opp'n"), and the SEC filed a Reply on September 7, 2018 (ECF 50, "Rep.").

Also on June 15, 2018, the Kirks filed a Motion for Summary Judgment, contending that the SEC's claims against them–Counts I, III, and IV of the Complaint–should be dismissed as time-barred (ECF 45). The SEC filed an Opposition in response on August 10, 2018 (ECF 49), and the Kirks filed a Reply on September 7, 2018 (ECF 51).

On October 18, 2018, the Court ordered the Kirks to file a Response to the SEC's Statement of Facts, specifically indicating its contentions as to material facts that are not in dispute (ECF 53). Per the Court's order, Defendants filed a Response on November 1, 2018 (ECF 54). Defendants moved for leave to file an amended Response to the SEC's Statement of Facts and amended Declarations of the Kirks on November 2, 2018 (ECF 55). The amended Response was attached to the Motion for Leave to Amend as Exhibit A (ECF 55 Ex. A).

Following a November 8, 2018 hearing on all open motions (ECF 57), this Court issued an Order granting the SEC's Consent Motion for Entry of Judgment of Liability against Place, overruling Defendants' general objections to the SEC's Statement of Facts, ordering Defendants to file a Second Amended Response and Seconded Amended Declarations in response to the SEC's Motion for Summary Judgment on liability, and allowing the SEC to file annotated slides and a Reply to the Second Amended Response (ECF 61). Defendants filed a Second Amended Response and Second Amended Declarations of the Kirks on November 15, 2018 (ECF 62, "Defs.' Am.

SOF"; <u>id.</u> Ex. 1, "Am. John Kirk Decl."; <u>id.</u> Ex. 2, "Am. Paul Kirk Decl."). The SEC filed a Reply and annotated slides on November 26, 2018 (ECF 65, "Am. Rep."; <u>id.</u> Ex. 1, "SEC Slides"), and Defendants filed slides in response on December 3, 2018 (ECF 66). On December 21, 2018, the Court denied the Kirks' Motion for Summary Judgment as to the statute of limitations (ECF 67, 68).

## IV.  Parties' Contentions

### A.  SEC's Motion for Summary Judgment

The SEC contends that Defendants are liable for securities fraud under three theories: (1) GTS and the Kirks misled clients by failing to disclose the commissions GTS earned in connection with transactions in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b); (2) GTS and the Kirks engaged in a scheme to defraud clients in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c); and (3) the Kirks are liable for GTS's fraudulent misconduct as control persons of GTS under Section 20(a) of the Exchange Act. (MSJ at 4.)

First, the SEC argues that the Kirks misled clients in violation of Rule 10b-5(b) because they made the following misrepresentations to current and prospective clients, directly and through GTS: (1) that GTS only earned explicitly disclosed commissions and fees on client transactions; (2) that GTS did not have conflicts of interest with clients, and its sole mission was to reduce client costs; and (3) that GTS's clients' transition costs were attributable only to market and timing costs. (<u>Id.</u> at 25.)[1]

---

[1] As addressed in the Court's opinion denying Defendants' Motion for Summary Judgment, the SEC notes that the Complaint was filed before the Supreme Court's opinion in <u>Kokesh v. SEC</u>, 137 S.Ct. 1635 (2017). (MSJ at 18; 2018 WL 6727998, at *7.) <u>Kokesh</u> held that the SEC could not recover disgorgement for fraudulent conduct that occurred outside the statute of limitations– more than five years before the Complaint was filed. Accordingly, the SEC provides specific examples of clients defrauded after August 8, 2011–five years before the Complaint was filed. (MSJ at 18–20.)

According to the SEC, the Kirks were the "makers" of these fraudulent statements, as required for direct liability under Rule 10b-5(b).  (<u>Id.</u> at 26.)  Specifically, the SEC alleges that John Kirk was a "maker" of GTS representations because he scripted or approved GTS messages and held the power to both edit communications and prohibit sales staff from deviating from pre-approved messages.  (<u>Id.</u>)  The SEC also contends that Paul Kirk was a "maker" of GTS statements to clients and consultants because GTS did not make statements without his approval.  (<u>Id.</u> at 27; ECF 44 Ex. 2, "SEC SOF" ¶ 49.)

Second, the SEC contends that John and Paul Kirk engaged in a scheme to defraud customers in violation of Rule 10b-5(a) and (c) by falsely labeling trading profits as "transaction cost analysis" ("TCA") in invoices sent to routing brokers ("BORs"), by concealing the markup[2] and markdown revenue[3] from James Zogby, the owner of GTS, Inc.; by diverting the revenue to a bank account that Zogby did not control or monitor; and by approving reports generated by GTS that deceived clients about the nature of their costs.  (MSJ at 34–35.)  The SEC also avers that John Kirk committed fraud by hiding GTS's true sources of revenue from GTS's sales staff, who he knew were interacting with clients.  (<u>Id.</u> at 35.)

In support of its securities fraud claims under Rules 10b-5(a), (b), and (c), the SEC contends that both Defendants acted with the requisite scienter.  (<u>Id.</u> at 38–39.)  The SEC argues that John

---

[2] A "markup" in the context of securities fraud is a "term of art" that is defined as "the difference between the price charged to the customer and the <u>prevailing market price</u>–not the price at which a market maker acquires the position for the customer."  <u>SEC v. Pasternak</u>, 561 F. Supp. 2d 459, 506 (D.N.J. 2008) (citation omitted).

[3] Defendants dispute throughout the Second Amended Statement of Facts that GTS received revenue from markups and markdowns, as opposed to "rebates for certain fees charged by the [BOR]."  (<u>See, e.g.</u>, Defs.' Am. SOF ¶ 29.)  In response, the SEC refers to alleged markups/markdowns as "markups/rebates" in the Reply but argues that "markups and rebates refer to the same thing."  (Am. Rep. at 1 n.1.)  The Court refers to "markups/markdowns" and "markups/rebates" interchangeably without drawing any conclusions as to the significance of these terms.

Kirk, a securities professional, knew that GTS's primary revenue source derived from markups and markdowns on trading in connection with client transitions and yet concealed this information from clients, consultants, and sales staff despite a duty to disclose it. (Id.) Similarly, the SEC contends that Paul Kirk, also a licensed securities professional, knew that GTS shared in profits with BORs in connection with client transitions, but nevertheless signed contracts that misrepresented or materially omitted the truth about how GTS earned money. (Id. at 40.) The SEC further contends that because Paul Kirk was GTS's compliance representative and General Counsel, his material misrepresentations and omissions were reckless as a matter of law. (Id. at 40–41.)

Lastly, the SEC contends that Defendants are liable for GTS's securities fraud as control persons of both GTS, Inc. and GTS, LLC because they aided and abetted GTS, Inc.'s violations of Section 10(b) of the Exchange Act. (Id. at 42–43.) In particular, the SEC argues that GTS committed securities fraud by concealing from clients that it shared in markup and markdown revenue with BORs and by delivering post-trade reports that mispresented the nature of clients' inflated costs. (Id.) According to the SEC, Defendants are liable for GTS's alleged fraud because they exerted control over GTS and neither ignored nor attempted to prevent GTS's fraudulent conduct. (Id. at 44–45.)

### B. The Kirks' Opposition to the SEC's Motion for Summary Judgment

In response, Defendants contend that GTS disclosed to its customers that it received both commissions and fees, that GTS's use of and fee sharing agreements with BORs did not raise clients' costs, and that Defendants did not control GTS because all decision-making authority was vested with John Place, to whom they reported. (Opp'n at 5–12, 15–17.) Defendants also contend that many of the SEC's factual allegations were based on inadmissible evidence that is

objectionable at the summary judgment stage.  (Id. at 4 n.3.)  Specifically, Defendants object to the SEC's references to the Place Declaration because Place is not a credible witness.  (Id.) Defendants contend that Place is not competent to testify, referring to a doctor's note that Place produced at his deposition, which stated that Place was suffering from a condition that made him unable to testify. (Id.)  As a result, Defendants argue that Place deprived them of the opportunity to cross-examine him. (Id.)  Defendants also contend that Place is not a credible witness because he is biased against them as an SEC witness.  (Id.)

### C.  SEC's Reply to the Kirks' Opposition

In the Reply, the SEC contends that Defendants have failed to create an issue of fact on the central dispute in this case: that GTS, acting as a fiduciary, did not disclose to its clients that the majority of GTS's compensation and clients' costs was derived from markups/rebates.  (Am. Rep. at 1.)  Rather, GTS communications, which were controlled and authorized by the Kirks, told clients that it made only stated commissions.  (Id. at 9–10.)

Next, the SEC seeks to undermine Defendants' argument that "commissions/fees" in client contracts sufficiently disclosed GTS's compensation structure to clients.  (Id. at 10.)  According to the SEC, Defendants' reference to rules of grammar in arguing that "commissions/fees" is equivalent to "commissions and fees" does not trump the actual record.  (Id. at 11–12.)  The SEC highlights examples in the record showing that GTS expressly told clients that it earned only stated commissions, and that GTS used the terms "commissions" and "fees" interchangeably.  (See id. at 11.)  Further, according to the SEC, "commissions/fees" also did not disclose to clients that the markups/rebates would result in increased transition costs.  (Id. at 11–12.)  The SEC adds that there is no dispute that the Kirks told clients that it was a fiduciary and had no conflict of interest, and that in communications with clients, including post-trade reports, the Kirks concealed that

there was a conflict of interest: the more clients paid for markups/rebates, the more GTS made. (Id. at 11.)

Finally, the SEC argues that the Kirks' Second Amended Declarations and Second Amended Response do not create genuine issues of material fact because they present only conclusory statements and speculation as to what other people "knew," and focus on the argument that "/fees" means "and fees." (Id. at 12–13) (citing Defs.' Am. SOF ¶¶ 90, 135; Am. Paul Kirk Decl. ¶ 56; Am. John Kirk Decl. ¶ 56; SEC SOF ¶¶ 106, 125, 135.)

## V. Summary Judgment Legal Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Federal Rule of Civil Procedure 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Id. at 255.

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.

After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule, [] set forth specific facts showing a genuine issue

for trial." Stell v. PMC Techs., Inc., No. 04-5739, 2006 WL 2540776, at *1 (E.D. Pa. Aug. 29, 2006) (Baylson, J.) (citing Fed. R. Civ. P. 56(e)); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (The nonmoving party "must do more than simply show that there is some metaphysical dispute as so the material facts."). Summary judgment is appropriate if the adverse party fails to rebut by making a factual showing "sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## VI. Discussion

As noted above, the SEC claims that Defendants are both primarily and secondarily liable under federal securities laws. The Court addresses each claim in turn.

### A. Primary Liability (Count I)

#### 1. Factual disputes preclude summary judgment on the SEC's Section 10(b) and Rule 10b-5(b) claim.

As noted above, the SEC seeks summary judgment on its claims under Section 10(b) of the Exchange Act and Rule 10b-5(b). Section 10(b) and its corresponding regulations prohibit fraud in connection with the sale or purchase of securities. Advanced Multilevel Concepts, Inc. v. Bukstel, 919 F. Supp. 2d 564, 571–72 (E.D. Pa. 2013) (Baylson, J.) (citing 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b)). Section 10(b) prohibits securities fraud by proscribing the "use or employ[ment], in connect with the purchase or sale of any security . . . [, of] any manipulative or deceptive device or contrivance in connection of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 supplements Section 10(b) and makes it unlawful "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange," to do the following in connection with the purchase or sale of any security:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary to in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b-5.

To state a valid claim for securities fraud in violation of Section 10(b) and Rule 10b-5, a plaintiff must prove that the defendants "i) made misstatements or omissions; ii) of material fact; iii) with scienter; iv) in connection with the purchase or sale of securities; v) upon which the plaintiff relied; and vi) that reliance proximately caused the plaintiff's injury." SEC v. Teo, 746 F.3d 90, 102 (3d Cir. 2014) (citation and internal quotation marks omitted). Unlike private litigants, the SEC is not required to prove reliance or damages. See GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 206 n.6 (3d Cir. 2001); SEC v. Lucent Techs., Inc., 363 F. Supp. 2d 708, 714 (D.N.J. 2005); see also SEC v. Stinson, No. 10-3130, 2011 WL 2462038, at *3 (E.D. Pa. June 20, 2011) (Schiller, J.) (providing the elements of securities fraud claims under Section 10(b) and Rule 10b-5).

### i. The Kirks used interstate commerce.

As an initial matter, the SEC has established that Defendants used various means of interstate commerce, including e-mail, to provide transition management services to clients around the country. See id. at *4.

### ii. Triable issues exist as to whether the Kirks are "makers" of allegedly false or misleading statements.

To be held liable for a false or misleading statement, a person must have "made" the statement. As the Supreme Court has instructed,

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate control over the statement, including its content and whether and how to communicate it. . . . One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by– and only by–the party to whom it is attributed.

Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142–43 (2011). A person is the "maker" of a statement if he signed the statement. See WM High Yield Fund v. O'Hanlon, No. 04-3243, 2013 WL 3231680, at *7 (E.D. Pa. June 27, 2013) (Davis, J.) (granting summary judgment in favor of defendant in securities action where the record did not show that the defendant made misleading public statements in audit opinions, as his signature did not appear on the opinions). Judges in other circuits have also concluded that "an executive may be held accountable [for a misstatement] where the executive had ultimate authority over the company's statement[,] . . . ratified or approved the company's statement[,] or where the statement [wa]s attributed to the executive." In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012) (citations omitted), aff'd, 525 F. App'x 16 (2d Cir. 2013).

The Court concludes that there are genuine issues of material fact as to whether the Kirks were the "makers" of allegedly fraudulent or misleading statements within the statutory period– after August 8, 2011. There is no genuine dispute that Paul Kirk was the "maker" of false or misleading statements contained in contracts he signed. However, there are triable issues as to whether pre- and post-trade reports and other communications allegedly "often" scripted or approved by either of the Kirks were also made by them.[4]

Unlike with Paul Kirk, the only allegedly unlawful statement expressly attributed to John Kirk that is arguably within the statute of limitations is his March 2011 City of Philadelphia

---

[4] Although the Court is denying summary judgment, the rule that the person who signs a statement is its "maker" is a legal conclusion appropriate for a jury instruction.

questionnaire response, and that is only if the City of Philadelphia transition can be construed as one, unified transaction.[5] There is also a genuine dispute over whether any misleading statements made on behalf of GTS during the statutory period could be implicitly attributed to John Kirk based on the surrounding circumstances. In terms of circumstances surrounding the City of Philadelphia transition, the SEC only argues that, throughout 2011, John Kirk continued to be copied on emails with the City and was only "one of the primary points of contact" at GTS for the City. (SEC SOF ¶ 132.) Complicating matters, the SEC does not specify which communications John Kirk drafted within the statutory period, with the exception of the March 2011 City of Philadelphia questionnaire response.

The record reflects that John Kirk, along with Place and GTS's compliance personnel "controlled, authorized, and often scripted the content of client and consultant communications." The Third Circuit has not addressed whether an executive such as John or Paul Kirk, as a matter of law, is the "maker" of a company statement if he ratified or approved the statement. However, Judge Davis of this district interpreted Janus as "rul[ing] that 'attribution is necessary' for any liability under Rule 10b-5(b)." In re DVI Inc. Sec. Litig., No. 03-5336, 2013 WL 56073, at *7 (E.D. Pa. Jan. 4, 2013) (Davis, J.) (quoting Janus, 131 S.Ct. at 147 n.11.); see also SEC v. Lucent Techs., Inc., 610 F. Supp. 2d 342, 357 (D.N.J. 2009) (granting summary judgment against the SEC on its Rule 10b-5(b) claims where the corporation's executives did not draft or sign the corporation's financial reports, and the reports did not contain any statements attributed to them).

---

[5] It is unclear whether the SEC's claims against John Kirk based on this statement accrued before the limitations period. Though this questionnaire is dated March 2011, before the statute of limitations, it pertains to the City of Philadelphia's transition event, which occurred on September 15, 2011, within the statute of limitations. (See SEC SOF ¶ 134.) The Court makes no definitive determination on this issue in ruling on the Motion for Summary Judgment.

Nor is the Court aware of any precedential judicial authority suggesting that an executive who approves a communication can be held liable, as a matter of law, as its "maker." Further, the reports generated during the statutory period, such as the Louisiana School Employees Retirement System post-trade report dated October 6, 2011, are not attributed to either of the Kirks, but instead indicate that Stephen Malinowski was the client's contact at GTS. (See, e.g., ECF 44-14, Bortz Decl. Ex. 53.)

Not only could reasonable minds differ about whether allegedly fraudulent or misleading statements during the limitations period can reasonably be attributed to John Kirk, but there are also genuine disputes about whether either of the Kirks exercised actual control over communications that were not expressly or impliedly attributed to them. This remains a fact issue.

The Supreme Court held in Janus that "the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it." 564 U.S. at 142. In other words, if a statement is neither attributed to nor delivered by a person, that person can only be the "maker" of that statement if he exercised actual control over its content and delivery. See, e.g., id. at 143 (explaining that a speechwriter is not a "maker" of the speech because "the content is entirely within the control of the person who delivers it"); but see Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 403, 427 (7th Cir. 2015) (holding that a CEO who wrote a statement had "ultimate authority" over the statement where another executive read the statement to the media verbatim).

The Third Circuit has not yet considered whether more than one person can hold "ultimate control" over a statement under Janus. Courts outside the Third Circuit, however, have concluded that "[n]othing in Janus precludes a single statement from having multiple makers. . . . And it's not illogical to conclude that [the CEO], who wrote the statement and instructed [an executive] to

deliver it, acted <u>knowingly</u>, while [the executive], who simply parroted it, was merely <u>reckless</u> as to its falsity." <u>Glickenhaus</u>, 787 F.3d at 427 (citations omitted).

With respect to John Kirk, the SEC contends that the sales team reported to him, that he oversaw "the marketing and business strategy of the firm," and that he "controlled, authorized and often scripted the content of client and consultant communications." (SEC SOF ¶¶ 1–2, 5, 46–48, 49.) According to the SEC, John Kirk reviewed and approved emails to consultants and clients and insisted that sales staff not improvise or deviate from scripts. (<u>Id.</u> ¶ 47.) For example, in September 2011, John Kirk created a promotional piece, and when David Bergman, a former employee of GTS who reported directly to John Kirk, suggested modification, John Kirk wrote in an email to Bergman, copying Place and Paul Kirk, that "[c]ase by case editing will not be allowed due to compliance reasons[.]" (<u>Id.</u>; ECF 44-10, Bortz Decl. Ex. 33.) Defendants, on the other hand, dispute that John Kirk controlled, authorized, or often scripted the content of client and consultant communications on his own. (Defs.' Am. SOF ¶ 47.)

Regarding Paul Kirk, the SEC avers that he approved all communications and signed GTS's contracts. (SEC Rep., at 13–14; SEC SOF ¶¶ 1–2, 5, 46–48, 49.) In contrast, the Kirks contend that Paul Kirk did not negotiate client contracts, but instead followed Place's instructions to ensure every client signed a contract. (Opp'n at 15–16.)

As noted above, the SEC has presented sufficient undisputed facts to allow the conclusion that Paul Kirk is liable for statements contained in client contracts that he signed. <u>See</u> <u>SEC v. Berlacher</u>, No. 07-3800, 2010 WL 3566790, at *9 (E.D. Pa. Sept. 13, 2010) (Goldberg, J.) (concluding that a contract's signatory is bound by the misrepresentations contained therein even if he did not remember signing or did not read the contract before signing).

However, reasonable minds could differ as to whether the Kirks exercised ultimate control over other client communications. The Court must conclude that there are disputed facts and thus, that the SEC is not entitled to judgment as a matter of law on the issue of whether the Kirks were "makers" of allegedly fraudulent or misleading statements during the statutory period, with the exception of client contracts expressly attributed to Paul Kirk. The evidence is insufficient to grant summary judgment on the SEC's Section 10(b) and Rule 10b-5(b) claim. Therefore, the Court only states legal conclusions on the remaining elements without granting summary judgment.

### iii. Some misrepresentations or omissions of material fact have been established as a matter of law.

To prevail on a Section 10(b) and Rule 10b-5(b) claim, "[a] plaintiff must establish that the defendant[s], acting with knowledge or recklessness, made a misrepresentation or omission of a material fact." In re Tyson Foods, Inc., 155 F. App'x 53, 56 (3d Cir. 2005) (citation omitted). A court determines whether a statement amounts to misrepresentation "'in the light of the circumstances under which' it is made." City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp., 908 F.3d 872, 882 (3d Cir. 2018) (quoting 17 C.F.R. § 240.10b-5(b)).

Where a plaintiff alleges that the defendants failed to disclose information, the plaintiff must establish a duty to disclose. Pasternak, 561 F. Supp. 2d at 498; see also Hoxworth v. Binder, Robinson & Co., 903 F.2d 186, 200 n.19 (3d Cir. 1990) (citation and internal quotation marks omitted) ("Silence, absence a duty to disclose, is not misleading under Rule 10b-5."). There is a "duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or volunteered, not misleading." SEC v. Kearns, 691 F. Supp. 2d 601, 616 (D.N.J. 2010) (quoting Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 641 (3d Cir. 1989)); see, e.g., Shapiro v. UJB Fin. Corp., 964 F.2d 272, 282 (3d Cir. 2002) ("[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and

the like, . . . the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting those representations").

Judges in this Circuit have noted that to prove securities fraud liability for an alleged omission of a "markup," the defendants must be (1) in a fiduciary relationship the complaining party; or (2) charged an "excessive" markup.  Pasternak, 561 F. Supp. 2d at 499 (citations omitted). "To determine the existence of a fiduciary relationship in federal securities fraud actions, district courts generally look to state law."  Id. (citation omitted).  Under Pennsylvania law, a fiduciary relationship arises "whenever one occupies toward another such position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's [best] interest." Conquest v. WMC Mortg. Corp., 247 F. Supp. 3d 618, 634 (E.D. Pa. 2017) (Slomsky, J.) (citations omitted and internal quotation marks omitted), appeal filed,  No. 17-1965 (3d Cir. May 1, 2017). In the absence of a fiduciary relationship, a defendant has a duty to disclose a markup if the markup is "excessive."  Pasternak, 561 F. Supp. 2d at 500 (citation omitted).  In determining whether a markup is "excessive," a court must conduct a fact-intensive inquiry.  Id. (citation omitted).  "A markup is excessive when it bears no reasonable relation to the prevailing market price."  Id. (citation and internal quotation marks omitted).

If a jury concludes that Defendants were "makers" of allegedly misleading statements during the statutory period, there is no genuine dispute as to the falsity of the alleged misrepresentations in client communications.  The record reflects that statements in client contracts and other communications failed to disclose the true nature of client costs and the revenue GTS earned from markups/rebates.  The undisputed evidence in the record also demonstrates that GTS affirmatively represented itself as a fiduciary to clients, giving rise to duty to disclose conflicts of interest.

### 1. Misrepresentations–Selected GTS Transitions During the Statutory Period

#### A. Sheet Metal Workers Pension Plan

For example, in an August 16, 2011 email from John Kirk to a GTS sales agent, copying Paul Kirk and others, John Kirk approved the content of a message to prospective clients claiming that GTS "give[s] you reports telling [consultant and client] beforehand how much a portfolio change should cost, and afterwards how much it did cost with total transparency." (SEC SOF ¶ 63; Kirk Dep. Tr. at 213:16–214:13.) On that same date, Paul Kirk signed a contract between Morgan Stanley Smith Barney and GTS, under which GTS agreed to provide transition management services to the Sheet Metal Workers Pension Plan. (SEC SOF ¶ 153.) The contract stated that "as specifically set forth in this Agreement, GTS does not generate any revenue of any kind from the Client or Client's trading activity." (Bortz Decl. Ex. 55 ¶ 6.)

The SEC has established without dispute that the September 26, 2011 post-trade report for the Sheet Metal Workers Pension Plan transition did not provide the transparency promised in connection with the transition. Specifically, the record reflects that the post-trade report failed to disclose that of the $470,000 "Market Impact" and "FX" costs, $217,198 was attributable to revenue created by markups/rebates, and GTS collected $110,615 of that revenue. (SEC SOF ¶ 154.) Though Defendants argue that the post-trade report revealed the "to-the-penny accounting" of all money returned to the Sheet Metal Workers Pension Plan after the trade, they do not dispute that GTS did in fact generate revenue from the trading activity. (Defs.' Am. SOF ¶ 154.)

#### B. Macomb County Employees' Retirement System ("Macomb County")

Similar to the Sheet Metal Workers Pension Plan contract, the parties agree that the July 20, 2010 Brokerage Consulting Agreement between GTS and Macomb County, which Paul Kirk

signed, stated that the BOR would charge "stated commissions" and then "remit a portion of the commissions/fees to GTS." (SEC SOF ¶¶ 142–43.) Defendants also do not contest that the contract stated that "[a]s a fiduciary, GTS agrees that it does not and will not make any revenue of any kind other than its share of the explicit commissions referred to in paragraph 4 above." (Id. ¶ 144.)

Though the Macomb County contract falls outside the statute of limitations, Defendants contend that Macomb County signed a "subsequent contract" with GTS that included enhanced disclosures explicitly permitting GTS to receive revenue derived from markups and markdowns. (Defs.' Am. SOF ¶¶ 144, 145, 146; Am. John Kirk Decl. ¶ 51.) However, Defendants do not attach the "subsequent contract," and instead cite to their own Declarations.

With respect to the Macomb County post-trade report for the August 29, 2011 transition, the SEC has submitted a Declaration and expert report of Dr. John R. Minahan, Ph.D. (ECF 44-26, Minahan Decl.) The Declaration of Dr. Minahan states that the total undisclosed revenues from this transition were $207,031, of which GTS received $124,219–more than four times the stated commissions it received. (Id. ¶ 29.) Defendants aver in response that the post-trade report included all costs paid by Macomb County for the transition event, all money put into the trade by the client, and all money returned to the client after the trade. (Defs.' Am. SOF ¶¶ 147, 148.) In support of these contentions, Defendants cite the entirety of the post-trade report and their own Declarations, which do not reference specific facts about the transition. Instead, the Declarations state that the transition event achieved "best execution" and that GTS informed clients that it received both stated commissions and rebates for certain fees charged by the BOR.[6]

---

[6] Defendants proffer the same arguments with respect to all other pre- and post-trade reports during the statutory period. (See, e.g., Defs.' Am. SOF ¶¶ 136, 137, 152.) These allegations fail to raise a genuine dispute of material fact as to whether pre- or post-trade reports approved by

### C. Louisiana School Employee Retirement System

Defendants make the same argument about a "subsequent contract" with respect to the Louisiana School Employee Retirement System contract, but also fail to attach this subsequent contract. (See SEC SOF ¶ 150; Defs.' Am. SOF ¶ 150; Am. John Kirk Decl. ¶¶ 53–54.) In contrast to the parties' original contract dated September 23, 2011, which similarly provided that the BOR would charge "stated commissions," Dr. Minahan's Declaration states that the undisclosed markup for this transition was $197,748, of which GTS received $107,464–nearly three times the gross stated commissions. (Minahan Decl. ¶ 36.) Defendants' references to "subsequent contracts" do not, by themselves, create genuine disputes of material fact as to the falsity of contracts signed by Paul Kirk.

### 2. Misrepresentations–"Commissions or Fees" and "Commissions/Fees"

In response to the SEC's voluminous record and expert evidence, Defendants seek to undermine the SEC's contention that GTS failed to disclose that it was entitled to fees and commissions in communications, including in client contracts. (Opp'n at 5–6.) The parties do not dispute that client contracts executed during the statutory period stated that the BOR "will remit a portion of the commissions/fees to GTS and disclose this arrangement on each confirmation it generates for Client's account." (SEC SOF ¶¶ 38, 98.) Defendants, citing this language, contend that "commissions/fees" denotes two separate forms of revenue–commissions and fees. (Opp'n at 5–6.) Defendants similarly contend that references to "commissions or fees" in other communications conveyed GTS's ability to receive commissions and fees. (Id. at 6.) These

---

the Kirks disclosed that GTS earned revenue outside of stated commissions. See Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991) (noting that the non-movants must set forth "specific facts" and "may not rest upon mere allegations, general denials, or . . . vague statements").

arguments do not raise a genuine dispute of material fact. A plain reading of the language cited suggests that "the commissions/fees" refers to only one form of revenue. Moreover, the Court notes that Defendants' use of "and/or" in their Opposition brief suggests that Defendants recognize that "commissions or fees" does not refer to both commissions and fees. (See id. at 4.)

### 3. Omissions

#### A. Duty to Disclose Clients' Costs

Based on these undisputed facts, the Court concludes that there is no genuine dispute that it was misleading to state in client contracts that GTS did not earn revenue outside of explicit commissions when, in fact, GTS generated revenue from markups/rebates. The record also reflects that pre- and post-trade reports reviewed and approved by the Kirks defined costs as "market impact" and "timing costs" without disclosing that these costs were attributed to markups and markdowns. (See SEC SOF ¶ 62; Defs.' Am. SOF ¶ 62); see also Kearns, 691 F. Supp. 2d at 616–17 (denying motion to dismiss where statements in securities filings attributing increased revenue to "increased sales to existing customers," without revealing that revenues were also generated from a fraudulent billing scheme, were misleading). As a result, such statements give rise to a duty of disclosure.

#### B. Duty to Disclose Conflicts of Interest

GTS's representations that it was a fiduciary also give rise to a duty to disclose.[7] It is also undisputed that in contracts signed by Paul Kirk, GTS stated that it would act as a fiduciary on an "ongoing basis," often specifying that its duties as a fiduciary would be consistent with federal and

---

[7] The Court notes that the SEC only asserts that GTS owed a fiduciary duty to clients, not that the Kirks necessarily owed a duty as well. The Kirks do not make any arguments regarding whether they, as opposed to GTS, owed a fiduciary duty to clients. Rather, they claim that GTS did not breach its fiduciary duty because GTS had no conflict of interest with clients, as GTS's trading model reduced costs and achieved "best execution." (See Opp'n at 5–7.)

state law. (SEC SOF ¶¶ 67–68.) Representations of GTS as a fiduciary give rise to a duty disclose any potential conflicts of interest. See Zandford, 535 U.S. at 823 ("[A]ny distinction between omissions and misrepresentations is illusory in the context of a broker who has a fiduciary duty to [his] clients."). Defendants do not present any evidence suggesting that GTS informed clients that it profited from markups/rebates in connection with client transitions–the alleged conflict of interest. (See MSJ at 28.) Overall, therefore, the record reflects that client communications contained misrepresentations and omissions sufficient to sustain a Section 10(b) claim.

### iv. Materiality has been established as a matter of law.

A misrepresented or omitted fact is material "if there is a substantial likelihood that a reasonable [investor] would consider it important" in making an investment decision. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). The statement or omission "must significantly alter the 'total mix' of available information, rendering it false or incomplete." SEB Inv. Mgmt. AB v. Endo Int'l, PLC, --- F. Supp. 3d ---, 2018 WL 6444237, at *15 (E.D. Pa. Dec. 10, 2018) (Savage, J.) (citing In re Aetna Sec. Litig., 617 F.3d 272, 283 (3d Cir. 2010)).

There is no genuine dispute that Defendants' alleged misrepresentations or omissions were material. The Kirks do not dispute that GTS's clients would consider commission rates and fees when selecting GTS to transition their investment portfolios, as prospective clients typically sought transition management services at the lowest possible cost. (See SEC Slides, at 10.). It is also undisputed that markups/rebates often amounted to a majority of transition costs. (See Rep. at 7; SEC Slides, at 18.) Though the parties disagree over whether the markups/rebates actually increased client costs, Defendants do not dispute that it was important for prospective clients to understand the cost structure to which they were agreeing when engaging GTS, or that clients would have wanted to know if GTS was earning revenue from markups or markdowns. (SEC SOF

¶ 108.)   The Third Circuit has not addressed whether omissions regarding the receipt of commissions are material, but judges in other Circuits have reached that conclusion.  See, e.g., SEC v. Hui Feng, No. 15-cv-09420, 2017 WL 6551107, at *10 n.26 (C.D. Cal. Aug. 10, 2017) ("Defendants' omissions regarding receipt of commissions is material as a matter of law, even assuming the overall cost to clients was the same regardless of the commissions received by Defendants.").  Further, the Kirks both testified that they knew that clients considered the fact that GTS was a fiduciary to be an important factor in their decision to select a transition manager.  (SEC SOF ¶ 70; Defs.' Am. SOF ¶ 70.)

The evidence in the record establishes that a reasonable prospective or current client would consider the nature of their costs, including that GTS had a potential conflict of interest with clients by earning markups/rebates on transactions, important in deciding whether to hire GTS. Therefore, assuming that client communications during the statutory period were "made" by the Kirks, these communications contained material misrepresentations and omissions of material fact.

### v. Defendants' conduct was "in connection with" the purchase or sale of any security.

It is also undisputed that the Kirks' conduct was "in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  Though GTS did not execute trades or take possession of assets, it assisted clients that needed to execute securities transitions to transition their portfolios. (See SEC SOF ¶¶ 4, 21; Compl. ¶ 21.)  The Supreme Court has instructed that the Exchange Act "should be construed flexibly, not technically and restrictively."  SEC v. Zandford, 535 U.S. 813, 813 (2002).  Accordingly, "[t]he SEC has consistently adopted a broad reading of 'in connection with the purchase or sale of any security.'"  Id.  Under a broad reading of Section 10(b), there is no genuine dispute that GTS's transition management services were provided "in connection with the purchase or sale of any security."

### vi. Scienter has been demonstrated as a matter of law.

Claims under Rule 10b-5 all require scienter. A misrepresentation or omission is made with scienter if Defendants had "a mental state embracing intent to deceive, manipulate, or defraud." Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 493 (3d Cir. 2013) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 309, 319 (2007)). The Third Circuit has instructed that recklessness satisfies the scienter requirement of Section 10(b) and Rule 10b-5. See SEC v. Infinity Grp. Co., 212 F.3d 180, 192 (3d Cir. 2000). Recklessness includes:

> [H]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the [defendant] must have been aware of it.

Id. (quoting McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979)).

The SEC argues that scienter is evidenced by the fact that the Kirks, licensed securities professionals, knew that GTS took markups and approved communications with prospective and current clients and consultants that both failed to disclose and materially misrepresented the true nature of clients' costs. (See SEC Slides, at 11−14.) As the Kirks do not dispute that they knew that GTS received both commissions and fees/rebates in connection with transitions and/or that they approved communications with prospective and current clients and consultants during the statutory period, there is no genuine dispute that the Kirks acted with the requisite scienter to sustain Rule 10b-5 claims.

### 2. Disputed facts exist as to the SEC's "scheme liability" claim under Rule 10b-5(a) and (c).

As noted above, Rule 10b-5 also prohibits "scheme liability." Rules 10b-5(a) and (c) provide, "It shall be unlawful . . . (a) to employ any device, scheme, or artifice to defraud, . . . [ or] (c) to engage in any act, practice, or course of business which operates or would operate as a fraud

or deceit upon any person.  17 C.F.R. §§ 240.10b-5(a), (c).  Though there is no clear Third Circuit

precedent on the standard for scheme liability, courts within the Third Circuit "premise scheme

liability on misconduct separate from misrepresentations and omissions violating Rule 10b-5(b)."

OpenGate Capital Grp. LLC v. Thermo Fisher Sci., Inc., No. 13-1475, 2014 WL 3367675, at *7

(D. Del. July 8, 2014) (citations omitted); see also Lentell v. Merrill Lynch & Co., Inc., 396 F.3d

161, 177 (2d Cir. 2005) (affirming motion to dismiss scheme liability claims where "the sole basis

for such claims [was] alleged misrepresentations or omissions").[8]

The SEC contends that summary judgment should be granted on its Rule 10b-5(a) and (c)

claim because the Kirks took multiple steps to create the false appearance of proper trading.  (MSJ

at 35.)  Specifically, the SEC contends that Paul Kirk falsely labeled trading profits as "TCA" in

invoices sent to BORs, that the Kirks concealed markup and markdown revenue from Zogby by

diverting it to a bank account that he did not monitor or control, that the Kirks approved reports

that deceived clients about the true nature of their costs, and that John Kirk hid GTS's true sources

of revenue from sales staff.  (Id. at 34–35.)  Each of these facts is disputed by both Defendants.

With respect to invoices to BORs, Paul Kirk contends that the basis of payments that INTL,

a BOR, sent to GTS from November 2011 through September 2012 was TCA services, not revenue

that INTL generated in connection with GTS client transitions.  (Defs.' Am. SOF ¶ 122; SEC SOF

¶ 122.)  There is also a genuine dispute over whether Zogby knew that GTS shared in revenues

created by markups and markdowns.  Though Zogby testified that he was unaware that GTS shared

in revenues or that GTS maintained a separate bank account for these revenues, Paul Kirk testified

---

[8] Because "Third Circuit case law on claims brought under Rule 10b-5(a) and (c) is sparse[,]"
particularly where the claims are brought by the SEC as opposed to private litigants, the Court
finds cases outside of the Third Circuit instructive.  In re DVI, Inc. Sec. Litig., No. Civ.A.
035336, 2005 WL 1307959, at *10 (E.D. Pa. May 31, 2005) (Davis, J.).

that Zogby was aware of GTS's sources of income based on "his position [] as compliance officer, his review and control over the bank accounts, his filing of the focus reports for the broker-dealer, his regulatory filings, and outside business activity documents submitted to him every year." (ECF 44-5, Paul Kirk Tr. at 52:1–11; Zogby Tr. at 70:25–71:8.)  On the same note, Paul Kirk testified that Zogby, as the broker-dealer, "did all the banking and taxes for GTS, Inc." (Paul Kirk Tr. at 54:5–10.)  Though Paul Kirk agreed that "at least some of the time period," the bank accounts would have consisted only of stated commissions, there is insufficient evidence in the record for the Court to conclude, as a matter of law, that the Kirks concealed markup and markdown revenue from Zogby by diverting it to a bank account that Zogby did not monitor in violation of Rule 10b-5(a) and (c).  (See id. at 54:11–22.)

The SEC's scheme liability claim cannot be premised on the Kirks' approval of misleading reports, as this is the same misconduct that forms the basis of the SEC's Section 10(b) claims.  See Lucent Techs., Inc., 610 F. Supp. 2d at 361 (quoting TCS Capital Mgmt., LLC v. Apax Partners, L.P., No. 06-cv-13447, 2008 WL 650385, at *22 (S.D.N.Y. Mar. 7, 2008) (dismissing Rule 10b-5(a) and (c) claims because "[t]he alleged 'deception in this case arose from the failure to disclose the 'real terms' of the deal,' which is 'nothing more than a reiteration of the misrepresentations and omissions that underlie plaintiffs [sic] disclosure claim.'"))  Further, as there is a genuine dispute over whether the Kirks "made" the misstatements in reports, the Court cannot conclude that the Kirks are liable for scheme-related conduct based on the same misrepresentations and omissions.  See SEC v. Kelly, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) (dismissing the SEC's scheme liability claim based on a misrepresentation where neither defendant "made" a misstatement under Janus); but see Lucent Techs., Inc., 610 F. Supp. 2d at 360 ("[W]hile a

defendant who had not made the fraudulent statements cannot be held liable for the <u>statements</u>, the same defendant may be held liable for the fraudulent <u>scheme</u> behind the misstatements.").

The SEC also alleges that, based on instructions from John Kirk, the GTS sales staff told consultants and clients that GTS only made stated commissions and did not make any other money on client transitions, citing three Declarations. (SEC SOF ¶ 51.) In the cited Declaration of Bergman, Bergman reviews an April 12, 2011 email from Bergman to Chris Carmody, the former regional director at GTS, which explained that GTS was paid only out of commissions. (ECF 44-16, Bergman Decl. ¶ 7.) Though this email falls outside of the statute of limitations, Bergman states that this email reflected his understanding of GTS's compensation structure through at least the Fall of 2012, and that this understanding "came entirely from the scripts that John Kirk prepared for me and what he told me orally." (<u>Id.</u>) This description, Bergman declares, was consistent with what he told clients through the Fall of 2012, and with what John Kirk instructed him to communicate to current and prospective clients. (<u>Id.</u>) The Declaration of Chris Carmody includes the exact same language as the paragraph cited in the Bergman Declaration. (ECF 44-18, Carmody Decl. ¶ 5.) The last Declaration cited is that of Stephen Malinowski. The Court is unable to locate this document in the record and, therefore, hesitates to make any conclusion on this issue.

In response, Defendants deny these facts, citing their own Declarations, which assert that instructions from John Kirk to the sales staff, if any, referred to compensation described in GTS contracts, which included "commissions/fees" language. (Defs.' Am. SOF ¶ 51.) Defendants reiterate the same argument made in response to the SEC's Section 10(b) claim–that "commission fees" or "commissions/fees" does not refer to a single form of revenue. (<u>Id.</u>) Though this argument does not raise a genuine dispute of material fact, as addressed above, John Kirk does state in his Second Amended Declaration that the sales team did not report to him "after 2011."

(Am. John Kirk Decl. ¶¶ 23–24.) The statutory period began on August 8, 2011, and thus, the record is not undisputed on this issue, and additional evidence will be necessary. Accordingly, the SEC has failed to present sufficient evidence for this Court to conclude, as a matter of law, that Defendants engaged in scheme liability.

### B. Secondary Liability (Count III)

#### 1. There are genuine disputes of fact material to the SEC's Section 20(a) claim.

The SEC also alleges that the Kirks are liable for aiding and abetting the securities violations of GTS in violation of Section 20(a) of the Exchange Act. (MSJ at 42–45.) Section 20(a) "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of Section 10(b)." Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 252 (3d Cir. 2009) (citing 15 U.S.C. § 78t(a); In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284 (3d Cir. 2006))); see also In re Loewen Grp. Inc., No. Civ.A. 98-6740, 2004 WL 1853137, at *26 (E.D. Pa. Aug. 18, 2004) (O'Neill, J.) ("A corporate officer or director can be liable under Section 20(a) for exercising control over a corporation that has committed securities fraud.").

To establish a violation of Section 20(a), the SEC must establish that: (1) Defendants are "controlling persons"; (2) the "controlled person" violated securities laws; (3) Defendants were "'culpable participant[s] in the fraud' in that [they] directly or indirectly induced the underlying violation"; and (4) Defendants "did not act in good faith." Pasternak, 561 F. Supp. 2d at 502 (quoting Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 890–91 (3d Cir. 1975)). Importantly, "[l]iability may be established whether the . . . defendant[s] [were] directly or indirectly involved in the fraud, and may be premised on inaction, but only if it is apparent that the inaction intentionally furthered the fraud or prevented its discovery." Rochez Bros., 527 F.2d at 890. As

the Third Circuit has instructed, "[i]naction alone cannot be a basis of liability." Id. To effectively establish the affirmative defense of good faith, "the controlling person [must] show that some precautionary measures were taken to prevent an injury caused by the controlled person." Pasternak, 561 F. Supp. 2d at 502 (citation and internal quotation marks omitted).

Here, Defendants contend that GTS did not violate Section 10(b) because it disclosed to clients that GTS earned both commissions and fees, and GTS reduced clients' costs. (Resp. at 5– 12.) Based on the undisputed facts addressed above, Defendants have failed to raise a genuine dispute as to GTS's liability under Section 10(b)–the second element of a Section 20(a) claim.[9] Defendants also do not raise any arguments regarding whether they were culpable participants in GTS's violation–the third element. Finally, there is no viable good faith defense–the fourth element–because Defendants knowingly participated in GTS's violations, as discussed above. See SEC v. Chester Holdings, Inc., 41 F. Supp. 2d 505, 527 (D.N.J. 1999) ("No good faith defense, of course, applies because defendants knowingly participated in [the controlled person's] violations by preparing, reviewing or signing the misleading financial statements."); see also SEC v. Todd, 642 F.3d 1207, 1224 (9th Cir. 2011) (quoting Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000) ("[A] defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation.")). Therefore, the Court's inquiry focuses only on the first element of a Section 20(a) claim–whether the Kirks were "controlling persons" of GTS.

The SEC bears the burden of establishing that Defendants were "control persons" of GTS. WM High Yield Fund v. O'Hanlon, 964 F. Supp. 2d 368, 398 (E.D. Pa. 2013) (Davis, J.). Individuals are "controlling persons" if they "had actual power or influence over the allegedly

---

[9] Though GTS, LLC has defaulted and GTS, Inc. has settled with the SEC, GTS's liability is relevant to the SEC's Section 20(a) claim against the Kirks. (See MSJ at 33 n.10.)

controlled person," GTS.  Id.  In determining whether an individual is a controlling person, "the courts have given heavy consideration to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof."  Rochez Bros., 527 F.2d at 890–91 (holding that the president, Chairman of the Board, and CEO was a "controlling person" of a corporation where he owned fifty percent of the issued and outstanding stock, ran the corporation's day-to-day business activities, and had the power to influence its policies and actions).  The SEC has defined "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract or otherwise."  O'Hanlon, 964 F. Supp. 2d at 399 (quoting 17 C.F.R. § 240.12b-2).

The SEC argues that John Kirk is liable for GTS's alleged unlawful conduct because John Kirk was the 48% owner and President of GTS, he managed GTS's day-to-day operations, he was head of the sales group, and he reviewed all external communications, including post-trade reports. (MSJ at 44; SEC SOF ¶¶ 1–2, 46.)  Paul Kirk was a control person of GTS, the SEC argues, because he was GTS's General Counsel and compliance representative; signed GTS's contracts; reviewed and approved all external communications, including post-trade reports; and, as one of the only people with knowledge of GTS's true business model, was tasked with invoicing BORs. (MSJ at 44–45.)

John Kirk concedes that he, along with John Place and GTS's compliance personnel, controlled, authorized, and often scripted the content of client and consultant communications. (Am. John Kirk Decl. ¶ 22.)  However, John Kirk asserts that the sales team did not report to him "after 2011," and that he was not responsible for creating promotional material for GTS.  (Id. ¶¶ 23–24.)  Both John and Paul Kirk aver that John Place, the majority owner of GTS, was the control

person of GTS because he was responsible or GTS sales and made all business decisions concerning GTS. (Opp'n at 16; Am. Paul Kirk Decl. ¶ 31; Am. John Kirk Decl. ¶ 31.) According to the Kirks, Place exercised control over GTS because their authority, duties, and decisions were subject to the express approval of Place, to whom they reported until Place demoted them in October 2012. (Opp'n at 16.)

The fact that John Kirk was the President of GTS, and that Paul Kirk was General Counsel and compliance representative at GTS, do not, on their own, demonstrate that Defendants were control persons of GTS. See In re DVI, Inc. Sec. Litig., 919 F. Supp. 2d 498, 511 (E.D. Pa. 2013) (Davis, J.) (noting that the defendant's titles of President, CEO, and Director of defendant corporation did not evidence what defendant actually could or did perform on behalf of the corporation). However, Defendants have failed to cite, and the Court is unaware of, any precedential judicial decisions suggesting that there can be only one individual who has the power or potential power to influence and control the activities of a corporation.

Further, Defendants' contentions that Place controlled GTS business decisions do not undercut the facts in the record demonstrating that Defendants had the potential power to exercise control over GTS. See Quiroga, 934 F.2d at 500. The record reflects that Defendants were actively involved in the activities of GTS when the allegedly fraudulent statements were made. They participated in the day-to-day operations of GTS by preparing, reviewing, or signing allegedly misleading contracts, pre- and post-trade reports, and other communications. See Chester Holdings, Inc., 41 F. Supp. 2d at 527 (granting summary judgment in favor of the SEC where defendant executives prepared, reviewed, and signed financial statements that contained material misrepresentations); cf. O'Hanlon, 964 F. Supp. 2d at 399 (granting summary judgment in favor of defendant director because, although he had "significant influence" over financing decisions a

committee member, the head of the committee exercised ultimate authority, and there was no evidence that the director exercised day-to-day control over the corporation's management or operations).

Though the evidence in the record demonstrates that the Kirks were involved in the day-to-day operations of GTS, there is insufficient evidence in the record for the Court to conclude, as a matter of law, that the Kirks were "controlling persons" of GTS. In particular, there is a factual dispute over whether the Kirks were able to influence or direct GTS's disclosures in client or consultant communications, the allegedly fraudulent conduct at issue. The Kirks contend that Place demoted them in the fall of 2012 because Place resisted their suggestions that GTS make additional disclosures regarding its sources of revenue. (Am. Paul Kirk Decl. ¶¶ 30–32; Am. John Kirk Decl. ¶¶ 30–32.) The SEC, on the other hand, contends that it was John Kirk, not Place, who resisted making additional disclosures. (SEC SOF ¶ 56.) This is a triable issue of material fact. Although the Third Circuit has explained that courts have given "heavy consideration" to individuals' potential power to influence and control GTS, as opposed to their actual exercise of this power, judges in this District have concluded that an individual is a control person if he "had actual power or influence" over the corporation. Rochez Bros., 527 F.2d at 890–91; O'Hanlon, 964 F. Supp. 2d at 398 (citations and internal quotations omitted). Viewing the inferences in the light most favorable to Defendants, as the Court must on summary judgment, Defendants have put forth evidence that reasonably rebuts the SEC's showing. Therefore, the Court will deny summary judgment on the SEC's Section 20(a) claim.

## VII. Conclusion

In sum, the Court concludes that there are genuine disputes of material fact as to whether the Kirks were "makers" of allegedly fraudulent or misleading statements and engaged in scheme

liability under Count I, and as to whether the Kirks were "controlling persons" of GTS for purposes of Count III. The Court also concludes, pursuant to Federal Rule of Civil Procedure 56(g), that there are no genuine factual disputes under Count I as to:

1. The Kirks' use of interstate commerce;

2. The materiality of alleged misrepresentations and omissions; or

3. That Defendants' conduct was "in connection with" the purchase or sale of any security.

For the foregoing reasons, the SEC's Motion for Summary Judgment will be granted in part and denied in part. An appropriate Order follows.

O:\CIVIL 16\16-4291 SEC v Place\16cv4291 Memo re MSJ on Liability.docx